FIRST STATE BANK OF HUDSON COUNTY, Appellant,

v.

The UNITED STATES of America.

No. 78–2013.

United States Court of Appeals, Third Circuit.

Argued March 21, 1979.

Decided May 30, 1979.

---

**560**

Daniel E. Horgan (argued), Waters, McPherson, Hudzin & McNeill, Jersey City, N.J., for appellant.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C., Robert J. Del Tufo, U. S. Atty., Newark, N.J., Ronald R. Glancz, Asst. Director, Appellate Staff, Harland F. Leathers, Sp. Asst. to the Asst. Atty. Gen. (argued), Civ. Div., Dept. of Justice, Washington, D.C., for appellee.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

On June 14, 1976, the New Jersey Commissioner of Banking closed the doors and seized the assets of the First State Bank of Hudson County (the "Bank"), a commercial institution chartered under the laws of New Jersey, whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"). Alleging that in the course of a bank examination the FDIC had discovered that the Bank's president was engaging in serious criminal violations involving the misapplication of bank funds but that the FDIC had negligently failed to report such discovery to the Bank, the Bank brought an action against the United States to recover damages pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq. (1976). Because we believe the FDIC, under the circumstances of this case, owed no duty to warn the Bank, we affirm the judgment for the defendant.

I.

The Bank began business in December 1969. In September 1970, Edward P. Dooley ("Dooley"), whose subsequent misconduct would contribute to the Bank's downfall, became president. In the autumn of 1971, the Bank applied for approval to open a new branch and this application occasioned a routine investigation by the FDIC. That investigation, which the FDIC began in February 1972, uncovered some questionable operations by the Bank.

In a report to the Bank, sent on June 1, 1972, the FDIC observed a "failure on the part of the active management to adhere to banking principles and related laws and regulations." The FDIC noted that a large portion of the Bank's loans were in arrears, that the Bank maintained insufficient credit information, that loans exceeded statutory lending limits and were improperly concentrated in a few borrowers, and that the Bank was lax in its internal controls. The FDIC urged "that effective action be taken to improve the unsatisfactory conditions noted." The report further detailed violations of New Jersey's banking statutes and

FDIC regulations and urged that effective action be taken as quickly as possible. Replying by letter to the FDIC on June 20, the Bank declared that it was taking steps to correct these problems. According to the Bank's complaint in the instant suit, this reply went to the FDIC over the signature of the secretary of the board of directors but had actually been prepared by Dooley. As the complaint alleges, the reply "contained willfully false information and deliberately concealed material facts known at the time only to Dooley."

The FDIC allegedly undertook a further investigation on July 11, 1972, without the Bank's knowledge, to verify the paydowns reported by the Bank in its letter of June 20. The examiner, Thomas J. Spillane ("Spillane"), is asserted to have made a second examination on September 11 and 12. While conducting these examinations, Spillane allegedly discovered that Dooley, in violation of law, was giving the FDIC false statements about the Bank's operations. He did not inform the bank of this discovery. On October 20, 1972, the Bank sent a second letter to the FDIC, which again affirmed that it was reforming its practices, but which the Bank asserts in its complaint contained willfully false information and deliberately concealed facts. The FDIC acknowledged this letter and requested further information. The Bank replied with another letter dated October 30, 1972, which it also characterizes as containing willfully false statements and misleading information.[1]

On July 19, 1973, after the FDIC had evidently informed the Bank more specifically about its president's misdeeds, the Bank summarily dismissed Dooley. Dooley later pleaded guilty to charges that he had misapplied funds of a bank insured by the FDIC. 18 U.S.C. §§ 2, 371 & 656 (1976). As the Bank alleges, it first learned in February 1976 that Spillane had discovered Dooley's misapplication of funds in July 1972 and that the FDIC had not immediately shared its knowledge with the Bank. Having first exhausted its administrative remedies, the Bank then filed a complaint against the United States, in which it asserted a cause of action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 (1976).

The Bank sought to recover from the United States for damages caused by Dooley between July 11, 1972, and July 19, 1973—when Dooley was discharged. The Bank contended that the FDIC had breached a duty to inform it of Dooley's misapplication of funds. Although the Bank argued that Spillane had actual knowledge of Dooley's crime, it alternatively pleaded that Spillane had failed to discover the malfeasance, and thus had violated the standard of due care. After the filing of this complaint, the Banking Commissioner of New Jersey seized the Bank's business and assets, which are now being liquidated. With the approval of the Superior Court of New Jersey, the Commissioner allowed the management of the Bank to prosecute this suit.

The United States moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) & (6) for lack of jurisdiction over the subject matter and for failure to state a claim, asserting the following reasons:

(1) The alleged negligence did not constitute a breach of any duty owed to the plaintiff;

---

1. A New Jersey State bank examiner also made an examination of the Bank as of the close of business on February 25, 1972. On July 26, 1972, eight directors of the Bank attended a meeting with officials of the State Banking Department and the FDIC regional director. The February 25, 1972, examination report was discussed. By letter dated August 3, 1972, to the Bank's board of directors, Andrew J. Kerns, New Jersey's chief bank examiner, summarized the July 26 meeting, the review of the January examination report, the significant problems facing the bank, and the lack of managerial control and supervision. Recommendations were specifically made and attention was directed to "the large number of [statutory] violations cited." The letter noted, *inter alia*, that "[t]he poor quality of your internal operations, systems, and controls was the subject of comment and also somewhat distressing . . ." and replies were requested, including the remedial action to be taken for each exception scheduled.

**562**

(2) The plaintiff's claim is excepted by the Federal Tort Claims Act because it arises from the exercise or performance of a discretionary function and an alleged misrepresentation, 28 U.S.C. § 2680(a) and (h); and

(3) The claim was not presented in writing to FDIC within two years after it accrued and it is therefore barred under 28 U.S.C. § 2401(b).

The district court granted the motion. Because the district court considered documentary evidence outside the pleadings, such as the FDIC Report on Examination, we treat the district court's action as a grant of summary judgment under Fed.R.Civ.P. 56. *Dindo v. Whitney*, 451 F.2d 1, 2 (1st Cir. 1971). *See also Hubicki v. ACF Industries, Inc.*, 484 F.2d 519, 523 (3d Cir. 1973).

## II.

■ The district court concluded that the FDIC could not be held to owe any duty, either express or implied, to the bank or to its shareholders. It reasoned that the duty to protect the corporate entity and its shareholders rested solely on the Bank's board of directors and that the 1972 Report on Examination by the FDIC put the Board on notice of the gravity of the Bank's affairs. The court also held that even if there were a duty by the FDIC to the Bank, the claims were barred by the misrepresentation (28 U.S.C. § 2680(h)) and the discretionary function (28 U.S.C. § 2680(a)) exceptions to the Federal Tort Claims Act, and by the statute of limitations, 28 U.S.C. § 2401(b).

The Federal Tort Claims Act permits suit against the United States

for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1976). The Bank must therefore show that the officials of the FDIC, if private persons, would have been liable to it under the law of New Jersey. *See Fisher v. United States*, 441 F.2d 1288, 1289 (3d Cir. 1971). There can be no liability unless, under New Jersey law, the officials of the FDIC would owe a duty to the Bank.

The Bank suggests three possible sources of a duty owed to it by the FDIC: (1) the statute creating the FDIC and mandating its supervisory and regulatory role over banks insured by it; (2) the FDIC Manual of Examination Policies; and (3) the FDIC's assumption of a supervisory role over the bank. After carefully reviewing the Bank's contentions as to the duty owed to it, we conclude that no duty arose from these sources, either separately or together.

■ New Jersey law instead places a duty of supervision upon each bank's board of directors. A New Jersey statute requires that the director of a bank must

take an oath that he will, so far as the duty devolves upon him, diligently and honestly administer the affairs of the bank, and that he will not knowingly violate, or knowingly permit to be violated, any provision of this act . . . . .

N.J.Stat.Ann. § 17:9A–103(B) (West Supp. 1979). It is, moreover, a general principle of banking law that "[i]f, through recklessness and inattention to the duties confided to him, frauds and misconduct are perpetrated by other officers and agents or codirectors, which ordinary care on his part would have prevented, [a director of a bank] is personally liable for the loss resulting." 1 Michie on Banks and Banking, ch. 3, § 63 (1973) (footnote omitted).

■ The Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 et seq. (1976), as amended by Pub.L. 95–630, 92 Stat. 3641 (1978) (the "Act"), sets up a system of insurance, the primary function of which is "stabilizing or promoting the stability of banks." *Doherty v. United States*, 94 F.2d 495, 497 (8th Cir.), *cert. denied* 303 U.S. 658, 58 S.Ct. 763, 82 L.Ed. 1117 (1938); *Fed. Deposit Ins. Corp. v. Godshall*, 558 F.2d 220,

221 (4th Cir. 1977). The purpose of the bank examinations by the FDIC under 12 U.S.C. § 1820(b) is to prevent losses that would result in claims against the insurance fund. Nothing in the Act purports to establish any duty requiring that the FDIC warn banks of irregularities perpetrated by their officials. When the FDIC carried out its responsibilities under the Act by examining the Bank, its purpose was to safeguard this system of insurance,[2] and not as the plaintiff contends, to fulfill an obligation to notify the insured bank of any unlawful banking practice of bank officials.

■■ The FDIC was not acting for the benefit of the Bank or even of the Bank's depositors and other creditors. If bank examinations by the FDIC reveal any irregularities or fraud, such examinations, though they may inure incidentally to the benefit of a bank, are intended primarily for the protection of the insurance fund. As the Senate Report on an amendment to the Act observed, the FDIC's "supervisory responsibilities relate to specific types of actions which have a direct bearing upon its role as insurer." S.Rep.No. 1821, 86th Cong. 2nd Sess. (1960), *reprinted in* [1960] U.S.Code Cong. & Admin.News, pp. 3234, 3236.[3] *Cf. Harmsen v. Smith*, 586 F.2d 156, 157 (9th

Cir. 1978) (in suit based on the National Bank Act, the court writes that "[a]lthough bank examinations may reveal irregularities and even fraud, which discoveries may redound to the benefit of innocent persons, including stockholders, that result is merely an incidental benefit to the examined banks").

■ None of the cases cited by the Bank supports its primary premise that bank examinations under the Act were intended to ring the alarm bell to arouse drowsy directors and misguided stockholders.[4] The Bank's reliance on *Deitrick v. Greaney*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940), is also misplaced. The suit in *Deitrick* was based on the National Banking Act, not the Federal Deposit Insurance Act, and merely concerned a claim on a promissory note given to the bank in that case by one of its directors as a substitute for shares of its own stock illegally purchased and retained by that bank. We hold that the Federal Deposit Insurance Act imposes no duty on the FDIC to warn the officers and directors of a bank about wrongdoing committed by one of its officials and discovered by the FDIC. The duty to discover fraud in their institutions is upon bank directors and they may not transfer it to the FDIC by the easy

---

**2.** The duties of the FDIC as set forth in the statute are as follows:

"There is created a Federal Deposit Insurance Corporation, which shall insure as hereinafter provided, the deposits of all banks which are entitled to the benefits of insurance under this chapter . . . ." 12 U.S.C. § 1811.

**3.** Although a subsequent Congress cannot speak for the intent of the Congress that passed an act, the later expressions found in a legislative history may carry some weight. *GTE Sylvania v. Consumer Products Safety Commission*, 598 F.2d 790 (3d Cir. 1979) typescript at 27, 37.

The Bank invokes a passage from the legislative history of the 1966 amendments to the Act. The Senate Report on the amendments announced that the bill would give the FDIC and other agencies "authority to issue cease-and-desist orders or suspension or removal orders subject to standards and procedures designed to protect both the institutions involved and their officials and the depositors, savers, and others interested in the sound and effective operations of the financial institutions." S.Rep.No. 1482, 89th Cong. 2d Sess. (1966),

*reprinted in* [1966] U.S.Code Cong. & Admin. News, pp. 3532, 3533. In the next sentence, however, the Report indicates that these powers serve a larger purpose—the prevention of "harmful consequences to the growth and development of the Nation's economy." *Id.*, Nothing in the passage negatives the conclusion that the bank examinations, in uncovering illegal or fraudulent conduct, afford the banks only incidental benefits.

**4.** *Westfall v. United States*, 274 U.S. 256, 258, 47 S.Ct. 629, 71 L.Ed. 1036 (1927); *United States v. Wilson*, 500 F.2d 715, 720 (5th Cir. 1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975); *Garret v. United States*, 396 F.2d 489, 491 (5th Cir.), *cert. denied*, 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364 (1968); *Doherty v. United States*, 94 F.2d 485, 497 (8th Cir. 1959); *Weir v. United States*, 92 F.2d 634, 636 (7th Cir.), *cert. denied*, 302 U.S. 761, 58 S.Ct. 368, 82 L.Ed. 590 (1937). *See also FDIC v. Godshall*, 558 F.2d 220, 221 (4th Cir. 1977); *Freeling v. FDIC*, 221 F.Supp. 955, 957 (W.D. Okla.1962), *aff'd per curiam* 327 F.2d 971 (10th Cir. 1963).

expedient of purchasing insurance protection from it.

The Bank also struggles in an energetic effort to comb a duty to it from the FDIC Manual of Examination Policies. This Manual, provided by the FDIC to its examiners, states, *inter alia*, that "[g]enerally and where feasible, upon discovery of an apparent violation the Examiner should report it to the bank's Board of Directors." Arguing that the Manual is a regulation with the force of law, the Bank contends that the Manual established Spillane's duty to warn the directors about Dooley's misapplication of funds.

▇▇▇▇ The FDIC did not issue the Manual as a substantive rule, the promulgation of which would have required notice and comment under the Administrative Procedure Act, 5 U.S.C. § 553 (1976). The Manual therefore does not have the force of law. *See Chrysler Corp. v. Brown*, —— U.S. ——, 99 S.Ct. 1705, 60 L.Ed.2d 208, 47 U.S.L.W. 4434, 4440 (April 18, 1979). It might nevertheless be argued that the Manual, although not issued as a substantive rule, could create a duty owed by an FDIC examiner to an examined bank, the violation of which might support an action under the Federal Tort Claims Act. *Cf. Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (with regard to internal manual of Bureau of Indian Affairs, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures"). But under the circumstances of this case, we hold that a manual setting up internal procedures and policies for insurance fund examinations does not create a right in the examined bank to require notice from the FDIC of irregular banking practices by its officials. In drafting the Manual, the FDIC may be presumed to have aimed at the achievement of the statutory objective served by bank examinations. As we have

previously noted, Congress intended the examinations to be a valuable means of protecting the important interests of the federal insurance fund, not a direct measure to protect the banks from the misconduct and shortcomings of their officials and employees.[5] The Bank, therefore, cannot predicate a claim on the alleged violation of the FDIC Manual which was issued only for internal operating purposes. *Cf. Griffin v. United States*, 500 F.2d 1059, 1070 (3d Cir. 1974) (suit under Federal Tort Claims Act lies if plaintiff comes within protections afforded by federal regulations); *Braitman v. Overlook Terrace Corp.*, 68 N.J. 368, 346 A.2d 76, 86 (1975) (under New Jersey law, suit lies when plaintiff is within class protected by state regulation).

The Bank submits, finally, that New Jersey would recognize an assumed duty of the FDIC to the Bank—a duty arising from the supervisory role allegedly undertaken by the FDIC. At the very least, the Bank argues, its contention about an assumed duty raises a disputed issue of fact, which the district court should not have decided either through dismissal of the complaint or through summary judgment.

▇▇▇▇ On the Bank's theory, the FDIC foresaw, or alternatively should have foreseen, the criminal conduct that ultimately wrought havoc on the Bank. Therefore, the Bank asserts that the FDIC is liable under section 302B or section 448 of the Restatement (Second) of Torts (1965), both of which sections concern the liability of defendants who could have foreseen the unreasonably risky conduct of third persons. As the Bank acknowledges, however, New Jersey law does not construct a duty from prescience alone. Liability depends upon some independent duty owed by a party to another. *Goldberg v. Newark Housing Authority*, 38 N.J. 578, 186 A.2d 291 (1962).[6] In an effort to find an independent duty in

---

5. Because the Manual does not create rights in the banks, we need not reach the Bank's argument that the Manual left no discretion in the examiner to withhold warnings about Dooley's wrongdoing.

6. We do not mean to imply that, under sections 302B and 448, the Restatement omits a requirement of an independent duty. *See* Restatement (Second) of Torts § 302, comments "a" & "b"; *id.* § 448 (concerning only superseding causes).

its behalf, the Bank focuses upon section 323 of the Restatement (Second) of Torts (1965) and looks for support in our decision in *Toole v. United States*, 588 F.2d 403 (3d Cir. 1978).

Section 323 of the Restatement contemplates liability when a person undertakes to render services to another and fails to exercise reasonable care in his performance:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

According to the Bank, the FDIC gratuitously undertook to supervise insured banks and is liable for its dereliction in the performance of that undertaking. The Bank cites case authority from New Jersey to support its argument that a volunteer is liable for the faulty execution of a gratuitous undertaking to assist another. *Freddi-Gail, Inc. v. Royal Holding Corp.*, 45 N.J.Super. 471, 133 A.2d 362 (1957). *See also Bauer v. 141–149 Cedar Lane Holding Co.*, 24 N.J. 139, 130 A.2d 833 (1957).[7]

■ We perceive little substance in the Bank's contention that the FDIC was performing "services" which it should have recognized as "necessary for the protection of the [Bank's] person or things." As long as the FDIC did no more than carry out its statutory responsibility to examine the Bank for insurance purposes, neither the FDIC nor the Bank could reasonably have believed that the agency assumed a duty to warn the Bank's board of the derelictions of their president and employee. Neither of the parties had any reasonable expectation that the FDIC was monitoring the conduct of bank employees out of any obligation, either statutory or assumed, to protect the bank. The examinations by the FDIC should not have been seen as "services" to the Bank.[8]

■ The Bank argues that its allegations about the FDIC's supervisory role raised an issue of fact that the district court ought to have left for determination at a trial. But the complaint alleges nothing more than (a) the failure to report to the Bank crimes that an FDIC examiner had uncovered in the ordinary course of his duties, and (b) examinations that led to a continuing exchange of letters about the Bank's questionable financial practices. The FDIC did nothing more than perform its statutory duty of examination. In the performance of that duty, it assumed no special relationship to or control of the Bank which claims reliance on the expectation of notice of irregularities uncovered by that examination.

Nor does *Toole v. United States, supra*, recognize any duty that the Bank can invoke in this case. In *Toole*, this court held the United States liable according to Pennsylvania law as the employer of an independent contractor because the Government assumed a duty toward the contractor's employees when the contract demanded peculiarly hazardous employment in the production of munitions. Just as the Bank alleges

---

7. We need not determine the exact contours of this doctrine under New Jersey law. It appears that New Jersey law, though following the same principle as the Restatement, may not be in complete accord with section 323. *See Bauer v. 141–149 Cedar Lane Holding Co.*, 24 N.J. 139, 130 A.2d 833, 839 (1957) (increased risk or reliance by plaintiff to be considered, but not "controlling" in determination of reasonableness). We also do not decide whether New Jersey courts would extend the principle of section 323 beyond "physical harm" in order to reach the kind of injury involved in this case.

8. Although the Bank alleges that the FDIC assumed a supervisory role, it does not argue for the FDIC's liability upon analogy with cases holding an insurer liable to employees of an insured corporation for negligence in inspections aimed at the discovery of physical danger. *See, e. g., Mays v. Liberty Mutual Ins. Co.*, 323 F.2d 174, 175–76 (3d Cir. 1973) (Pennsylvania law). We therefore do not reach this issue.

that the FDIC examiner had actual knowledge of Dooley's crimes, so in *Toole* a government inspector had actual knowledge of a danger and failed to give warning. But the holding in *Toole* is expressly limited to a prediction of Pennsylvania law concerning "extraordinarily dangerous" or "ultrahazardous" activities, such as the manufacture of explosives by the employer's contractor. 588 F.2d at 406, 408. Because no such situation is present here, *Toole* affords no support to the Bank's case.

### III.

Because we hold that the district court correctly decided that the FDIC owed no duty to the Bank, we do not reach the district court's alternative holdings that even if there were a duty to the Bank, the claims were barred by the misrepresentation and discretionary function exceptions to the Federal Tort Claims Act, and by the statute of limitations.

The judgment of the district court will be affirmed. Costs taxed against appellant.